# CARL GIST v. RACKLIFFE-GIBSON CONSTRUCTION COMPANY, Appellant.

## In Banc, December 21, 1909.

1. **PUBLIC IMPROVEMENTS: Ordinances: How Construed.** Street improvements are a necessity of modern city life, and all streets and alleys must be eventually graded and paved; and city ordinances providing for them should not be considered from the viewpoint that street contractors are naturally careless and procrastinating, or city councils are prone to draw ordinances so loosely and accommodatingly as to encourage such carelessness or procrastination or as to unnecessarily inconvenience the public. All laws should be assumed to have been passed in a spirit of justice and for the welfare of the community, and courts should not indulge in any sour or frosty presumption in regard to them.

2. ———: **Extension of Time: Bad Weather, Etc.** An ordinance requiring the public improvement to be completed within ten months, and excluding from that time all days lost because of bad weather, strikes, fires in the factory making the material, injunction suits, etc., is not violative of the statute (Laws 1903, p. 64, sec. 9) prohibiting an extension of time for a longer period than four months, and not more than two extensions in all, and no extension at all until the contractor shall in writing agree to reduce his contract price by five per cent. [Disapproving Rackliff v. Peters, 136 Mo. App. 168.]

3. ———: ———: **Upon a Price: Meaning of Statute.** The extensions intended to be interdicted by the statute were those of such class and character as in the very reason of things ought not to be granted except on condition and at a price named, to-wit, a reduction of five per cent for such extension from the whole contract price. It was not the intention of the Legislature to take from the city council the power to relieve the contractor for losses of time for which he was in no sense responsible. The charge of five per cent as the price of an extension of time have reference to those extensions, made necessary or convenient by the acts, procurement, omissions, slips, lapses, misadventures, negligences and inadvertences of the contractor and his associates.

4. ———: ———: **Fixing Time: Meaning of Fix.** The statute in requiring that "every ordinance for a public improvement

224 Sup—24

shall fix the time within which such work shall be completed after the contract therefor shall be awarded," did not use the word "fix" in its sense of inflexibility, but the language means to prescribe or fix the rule by which the time is to be determined, and that implies that the ordinance may excuse the contractor for loss of time due to strikes, injunction suits, bad weather, etc. ·

5. ————: Ordinance: Proviso: Void and Act Valid. Provisions in an ordinance and contract for a public improvement, inserted by way of a proviso, if repugnant or inconsistent with the purview of the act, may be held to be void, and the balance upheld as valid and binding. A proviso in a contract, if inconsistent and repugnant to its other parts, and all the parts are not interdependent, will not be permitted to prevail over the other parts.

6. ————: Notice. The "designating notice," required to be given for five days, by section 8, Laws 1903, page 64, notifying the abutting property-owners that the street is to be improved in certain particulars and of the time and place where the citizens may meet with the board of public works and make objections and advise with the board, is not insufficient because it does not briefly state the terms of the ordinance as to grade, time and materials. It need not particularize those things. Other provisions of the statute specifically contemplate subsequent steps providing for them will be taken.

7. ————: Due Process. Special assessments for local public improvements are referable to the taxing power; and publications of notice to the property-owners and opportunity to be heard before the tribunal having the duty of ascertaining the facts and acting in the special assessment procedure, satisfy the constitutional requirement and amount to due process of law as to those matters.

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman*, Judge.

REVERSED AND REMANDED (*with directions*).

*Fulkerson, Graham & Smith* for appellant.

(1) The petition did not state a cause of action. (a) The ordinance "fixes" the time at ten months. This is definite and obeys the mandate of the statute requiring the ordinance to "fix" the time within which

such work shall be completed, etc. Then follows in the ordinance, a proviso clause extending the time (for the completion of the work) under certain conditions that may happen. Does this proviso nullify the main text? If the proviso is not in harmony with the main text, should not the proviso clause alone be construed as non-effective, and therefore mere surplusage? Why give to it, as the trial court has done, the effect of rendering the whole enactment void? For the validity of appellant's contract does not rest in any way upon the validity of the proviso clause in the ordinance. Appellant was not compelled to rely upon its provisions. Where a proviso is repugnant to or inconsistent with the purview of the act, the latter must prevail. Penick v. High Shoals Mfg. Co., 38 S. E. 973; Jackson v. Moye, 33 Ga. 302; 26 Am. and Eng. Ency. Law (2 Ed.), p. 681; Dugan v. Bridge Company, 27 Pa. St. 303; Ex parte Mayor's Court of Lancaster, 4 Clark 315; Barksdale v. Elam, 30 Miss. 694; St. Louis, J. & C. R. Co. v. Mathers, 71 Ill. 592; Benjamin v. McConnell, 46 Am. Dec. 474; Dugan v. Bridge Co., 67 Am. Dec. 464; Myers v. Davies, 49 Ky. (10 B. Mon.) 394; In re Webb, 34 How. Prac. 247. (b) Even though the court may find the proviso clause void, still that does not make void the entire ordinance. The ordinance itself would still be good. St. Louis v. Turnpike and Ferry Co., 14 Mo. App. 216; St. Louis v. Railroad, 89 Mo. 44; Lamar v. Weidman, 57 Mo. App. 507; Rockville v. Merchant, 60 Mo. App. 365; State v. Clark, 54 Mo. App. 36; State ex rel. v. Pond, 93 Mo. 635; State ex rel. v. Field, 119 Mo. 612; Railroad v. Evans Brick Co., 85 Mo. 307; State v. Bockstruck, 136 Mo. 335. (2) The designating notice was sufficient. It is all that is required by the statute.

*K. B. Randolph* for respondent.

(1) It is provided in Laws 1903, page 64, section 9, as follows: "Every ordinance for public improve-

ments of any kind to be let to the lowest and best bid-
der shall fix the time within which such work shall be
completed after the contract therefor shall be
awarded.'' If the language of the contract above
quoted is in harmony with, and not inconsistent with
the laws we have just quoted, then of course, this con-
tract and the ordinance authorizing it, are both valid,
and the demurrer, so far as that point is concerned,
shall have been sustained. This question has been re-
cently passed on by the Kansas City Court of Appeals.
Rackliffe v. Peters, 136 Mo. App. 168. In that case
it is held that the ordinance containing those provisions
and consequently the contract following the provisions
of the ordinance, is void in that it wholly fails to meet
the requirements of the charter of the city. The posi-
tive direction of the charter is that the ordinance pro-
viding for the work must ''fix'' the time, and while
there are several definitions of the word ''fix,'' they
are all in harmony; and we find that the word means,
to make certain or sure; to permanently settle; to
set a limitation upon. San Francisco Woolen Com-
pany v. Brickweddle, 60 Cal. 166; City v. King, 38
App. Div. 610, 57 N. Y. Supp. 162. (2) The notice
published by the board of public works and set forth
in the petition, is not in compliance with sec. 8, Laws
1903, p. 63. The section requires that notice shall be
published for five days, giving notice of the time and
place when and where said board will hear objections
to said proposed ordinance. The provision is not as
to the proposed work, but as to the proposed ordinance.
The terms of the ordinance should be briefly stated and
a notice of what work was contemplated is not a notice
as to a proposed ordinance. The property-owners
might be interested as to whether or not the paving
was to be laid to the established grade, as to whether
or not the contractor was to have three months or ten
months in which to complete the work, and as to what
material was contemplated, whether brick, asphalt,

macadam, etc. The property-owners might be satisfied as to some ordinances and not as to others. This section of the charter evidences that the ordinance must be prepared before the notice is published; then why are not the board of public works required by that section to give notice as to the ordinance and ask for objections to the ordinance, instead of simply saying that they intend by ordinance to improve the street by paving? This question all turns upon the proper construction of said section 8. City of Kirksville ex rel. v. Coleman, 103 Mo. App. 215.

LAMM, J.—Coming here from the circuit court of Buchanan county, this case was advanced for hearing In Banc.

St. Joseph is a city of the second class. In 1903 the General Assembly (Laws of 1903, p. 60) passed an act creating a Board of Public Works in cities of that class and giving such board great power along the line of supervising, grading, paving and cleaning streets and alleys, etc. Section 8 of the act ordains, among other things, that: "The board, of its own motion, if approved by all of its members, may, and upon presentation of a petition, signed by the majority in front feet of the resident real estate owners, required by law, shall prepare an ordinance for the improvements therein contemplated, and submit such ordinance, together with a copy of the petition for such improvements, if there be a petition, together with all objections thereto that may have been filed with the board, and accompanied with such recommendations as it may desire to make to the common council, and also transmit to the common council, with the proposed ordinance for any improvements full plans and estimates of the costs of the improvements contemplated, provided that before said board shall, on its own motion, or on the petition of others, submit an ordinance for the making of such improvements it shall, by an

advertisement in the official paper of the city publish [sic], for five days, notify all persons interested of the time and place, when [sic] and place [sic], when and where the said board will hear objections to such proposed ordinance, at which time and place the board shall attend and hear and pass upon all objections that may be presented. And if the board shall overrule such objections, then the matter shall be continued for fifteen days, and within that time the owners of a majority of front feet abutting on the part of such highway or public place sought to be improved and owned by residents of said city, shall have the right to select, in writing, any material they may desire to be used in making said improvement, and such selections only shall be embraced in the ordinance which the board may recommend, and no ordinance specifying any material other than that so selected shall have any validity, provided that the material so selected shall be reasonably available. If no such election shall be made by the property-owners, then the board may recommend and the city council pass an ordinance for doing the work with any desired material.''

Section 9 provides, among other things, as follows: ''The common council shall not give its consent by ordinance, resolution or otherwise more than twice for any extension of the time for the completion of the work under any contract for street improvement, ·nor for a longer period than four months each time, and not then, unless the contractor, together with the securities on his bond, shall first file with the comp-troller their written requests for such extension, and consenting for each extension asked for that the contract price for the whole work covered by the contract shall be reduced five per cent, and if such extension is granted, it shall operate as a reduction of the contract price for the whole work in conformity with the consent so given. Every ordinance for public improvements of any kind to be let to the lowest and best bid-

der shall fix the time within which such work shall be
completed after the contract therefor shall be awarded.
Nor shall any extension for the completion of a con-
tract for public improvements be granted after the
expiration of the time named in the ordinance author-
izing the work, except that where a first extension is
made before the expiration of the time for completing
the original contract a second extension may be
granted before the first extension expires—all upon
the terms and conditions in this section provided.''

At a certain time the Board of Public Works of
St. Joseph, desiring to improve Twenty-second street,
from a designated point at the south, viz., Highway
Bridge, to the north line of a street known as Fred-
erick, caused to be published the five-day notice pro-
vided by said section 8, such notice having come to
be called a ''designating notice.'' Such designating
notice was as follows (matter pertinent to other pend-
ing improvements being omitted):

''Office of the Board of Public Works, City of St.
Joseph. Public notice is hereby given that all parties
interested are required to take notice that the Board
of Public Works, of its own motion, approved by all
of its members, will as soon as practicable, after five
days from May 21st, 1907 cause to be introduced in
the Common Council of said City of St. Joseph, Mis-
souri, ordinances providing: . . . 'For improv-
ing Twenty-second street from the south end of the
Highway Bridge, located between Douglas street and
Grand avenue, to the north line of Frederick avenue,
by preparing the roadway, alleyways and sidewalk
space, constructing new curb, recutting or resetting the
old curb, where necessary, laying or relaying of the
sidewalks, gutters and crosswalks, where necessary,
and paving the roadways and alleyways, excepting be-
tween the rails and eighteen inches outside thereof
of the St. Joseph Railway, Light, Heat and Power
Company's tracks.'

"And that the Board will meet at its office in the City Hall, St. Joseph, Mo., Monday, May 27th, 1907, at 10 o'clock a. m., to hear and determine any objections that may be offered to said motion, work and ordinance."

The proper time having elapsed and due steps having been taken, an ordinance was prepared by the board and submitted to and passed by the common council of St. Joseph for the improvement of said street. Said ordinance provided, among other things, as follows: "And that the work be completed within ten months after the contract shall be awarded, provided the days' work lost in consequence of injunction or court proceedings, bad weather, work which is being done by other persons over whom the contractor has no control, organized general strikes or burning of any plant where material for the work provided in this ordinance is manufactured, shall be added to the number of days above specified. All in accordance with plans and specifications therefor on file in the office of the Board of Public Works."

Under that ordinance bids were called for and defendant corporation was the lowest bidder. Following the aceptance of such bid, a contract with apt narrations was duly entered into on the 30th day of July, 1908. One of its clauses carries forward the above ordinance provision relating to adding to the ten months the days lost by injunctions, bad weather, etc.

Presently defendant corporation began work. Thereupon Mr. Gist, as owner of real estate abutting on the part of Twenty-second street to be improved, brought a suit in equity. His bill, after narrating in detail all steps taken leading up to the ordinance, the contract and the beginning of the work, charges that the ordinance was void and of no effect and that the contract was infirm (quoting) "for the reason that no time is specified in either ordinance or said contract

in which the work must be completed as required by the charter of the city of St. Joseph;" and for the further reason (quoting): "That the pretended notice issued by the said Board of Public Works of the city of St. Joseph, commonly called a designating notice, and hereinbefore set forth, is not in conformity with the charter and laws governing cities of the second class, and is in violation of section 30 of article 2 of the Constitution of the State of Missouri in this, that it seeks to deprive the plaintiff of his property by assessing thereon special taxbills for the doing of said work without due process of law."

The life of his bill was injunctive relief, on the theory that the special taxbills (to be issued under the void ordinance and contract scheme) would cast a cloud upon his title.

Defendant Construction Company demurred generally. The demurrer was overruled, and defendant, refusing to plead over, elected to abide its demurrer. Thereupon a decree went granting the relief prayed, cancelling the contract, finding the supporting ordinance null and void, perpetually enjoining defendant from prosecuting work under either, and for costs. Thereat defendant appealed.

The propositions to be ruled are three.

*First,* was the designating notice a violation of section 30, article 2, of the Constitution in seeking to deprive plaintiff of his property by assessing thereon taxbills for the doing of said work without due process of law?

*Second,* was the designating notice in conformity with the charter and laws governing cities of the second class?

*Third,* was the ordinance void because it fixed no time for the completion of the work?

I.   The point presented in the third proposition was ruled in Rackliff v. Peters, 136 Mo. App. 168.

That learned court ruled that the same ordinance provision here failed to meet the requirements of the city charter (section 9, *supra*), "was a manifest evasion of the positive mandate of that instrument;" and that the ordinance was void as were the taxbills issued thereunder. It was said, *arguendo,* in that case: "In the ordinance in this case a time was fixed and immediately unfixed, without time for a breach between the doing and undoing, by inserting exceptions, provisos, and contingencies sufficient to cover every wish of a careless and procrastinating contractor. So as to put the matter in such way that no chance would arise for doubt or evasion, the charter itself provided how a time once fixed by an ordinance might be altered. It provided, as is shown by what we have above quoted from it, that if matters afterwards arose which, in the judgment of the council, demanded a change of time, the council would then pass upon the merit of the contingency urged in writing in support of the extension, and act accordingly, exacting for the property-owner the reduction named. These provisions were thus made a part of the charter in order to protect the property-holders, and to save the public generally that inconvenience which follows public work in the streets."

It is plain, therefore, that if we follow the doctrine of that case our task is done and the decree should be affirmed. But we all with one accord agree that the case should not be followed. This because:

(a) The law must not be written from the viewpoint that street contractors have a natural bent to be careless and procrastinating; that city councils are prone to draw ordinances so loosely and accommodatingly as to encourage such carelessness and procrastination and unnecessarily inconvenience the public; or that courts of justice must assume, at the outstart of a given investigation, that the abutting property-owner at all times needs judicial protection against

natural, preying enemies, to-wit, careless and pro-
crastinating street contractors and accommodating
city councils. No principle of law known to us re-
quires that abutting property-owners. be taken as
standing *rectus in curia* to be viewed with a tender eye,
while the others stand as objects of suspicion to be
viewed with a cold, a calculating, or averted eye. In
court contractor, city council and abutting owner meet
upon a level. Neither has any advantage of the other.
The law assumes that contractors are honest, prompt
and efficient, *i. e.*, do their duty until the contrary ap-
pears. City councils may repose in the bosom of the
same friendly assumption. So may the owner of abut-
ting property who is paymaster. No doubt there are
street improvements wronging the abutting property-
owner, and others in which the contractor suffers
wrong. It is the business of courts to right those
wrongs when shown to exist. It is not their business
to assume they are likely to exist or to indulge in any
frosty presumption that either party to such contro-
versy has a predilection or predisposition to perpe-
trate such wrongs.

It is a fundamental proposition that laws, whether
state or municipal, are presumed passed in a spirit of
justice and for the welfare of the community. It fol-
lows they should be so interpreted, if possible, as to
further that purpose. Therefore, while laws and ordi-
nances anent the improvement of streets should be sub-
jected to reasonable analysis and construction, yet
they should not be subjected to an over-nice analysis
or to any unfriendly construction, springing from the
notion that the contractor is prone to mischief or that
street improvements are evils to be judicially circum-
vented. This, because it will be found that such view
is bound to end in hardship on the abutting owner as
well as the general public. We take it as a self-evident
truth that the more technical and sour courts become
in interpreting street improvement contracts, ordi-

nances and laws, the more danger and moral hazard to the contractor creeps into every such improvement. So (as in insurance) the more the danger and moral hazard, the higher the bid of the contractor for his own self-protection in discounting that danger and moral hazard. Now, the higher his bid, the greater the cost for a given improvement. No one would deny that street improvements are a necessity of modern city life and that all streets and alleys must be eventually graded and paved. In that behalf every citizen of a town must at some time dance and pay the fiddler. Hence, he has an abiding and substantial interest in having ordinances, laws and contracts relating to such improvements construed with the utmost fairness and justice and without such nice particularity and over-refinement as unduly increase the risk of the contractor, drive up his bid and (as surely as night follows day) end in burdening those who have the bills to pay. In other words, those who live in towns are vitally interested in a situation producing the lowest responsible bidding in street improvement and inviting the most efficient competition, therefore courts can do no better service than to aid that happy consummation with every allowable art and reason of the law. If, now, instead of a spirit of friendliness to such improvements, contracts, ordinances and laws (that is, assuming they are legal and just until the contrary appears), courts assume a frosty attitude, searching as with a lighted candle for technicalities, inadvertences and minor defects, not of substance, and assigning them an office in overturning an improvement scheme and defeating the collection of taxbills, then the hazards of street contracting are enhanced, competition is stifled and the price bid is swollen to the extent that the extra hazard is met with extra pay.

(b) Section 9, *supra,* should be construed in the light of the foregoing general observations. It evidently was the legislative intention to prohibit ordi-

nances granting more than two extensions of time for the completion of street work and neither of such extensions should be for more than four months. The extensions expressly struck at are such as arise after the passage of the street-improvement ordinance and the execution of the contract, and neither the language nor intent of the statute, up to this point, was intended as a limitation of power on the city council in passing the original street-improvement ordinance. However, there is a limitation on such power in a subsequent clause requiring the original ordinance to fix the time within which such work shall be completed after the contract therefor shall be awarded. It becomes vital, then, to ascertain from the language and reason of the statute what sort of extensions were within the contemplation of the lawmaker and what is meant by fixing the time in the original ordinance.

(1) In the first place it is evident (if we are to credit the lawmaker with fairmindedness) that the extensions intended to be interdicted by the statute were of such class and character as in the very reason of things ought not to be granted except on condition and for a price named, to-wit, a reduction of five per cent for each extension from the whole contract price. It looks reasonable that a Legislature would not exact a *quid pro quo* or raise a charge for a thing which in just and fair dealing should go as of course and gratis, therefore the fact that a price is put on the extension throws some light on what was in the mind of the lawmaker. Let us see, then, what sort of extensions of time for street work should be paid for. Extensions naturally divide themselves into two sorts, viz.: *First,* those springing from an independent force or cause (akin to *vis major*) operating to the detriment of the contractor, over which he had no control and for the existence of which he was not to blame; and, *second,* those made necessary or convenient by the acts, procurement, omissions, slips, lapses, misadventures,

negligences or inadvertences of the contractor or his associates in the enterprise. It is plain that an extension of the latter sort could not of right be claimed without money and without price. It is not so clear, as will presently appear, that an allowance of time for delays springing from independent causes is the proper subject of a charge. We would naturally expect, therefore, that a statute would provide for a charge in one case and not intend one in another. Is the statute in hand susceptible of the construction suggested?

What justification exists in the realm of good sense for punishing the contractor with a five per cent rebate for allowing him time lost by enumerated controlling independent causes for which causes he was in nowise to blame?

Take a case: A contractor has two months to complete a job. He furnishes material and labor, say, for one month. At this stage he is stopped by the strong arm of the law, viz., an injunction writ on a bill challenging the validity of the contract and its supporting ordinance. After three weeks the injunction is lifted. He then goes on with his work relying on the proviso in his contract and ordinance. Was it the intention of the Legislature that such a contractor should apply to the city council for an extension and be mulcted in a five per cent rebate, on the hard alternative of otherwise losing all his time, labor and material? If so, what public policy is subserved by such unjust and harsh regulation?

Or take another case: A contractor has three months to grade and pave a street. The city council, as may well happen, concludes to lay water and gas mains while the street is under reconstruction so that the new pavement may not be presently broken and torn up for such purposes. Accordingly it proceeds to lay such mains or cause them to be laid, during which time work on the paving contract is necessarily sus-

pended. A month goes by and the paving contractor resumes work. He now finds his time short unless the proviso in the ordinance and contract save him. Are we to understand that the Legislature intended he could have no relief except by getting an extension ordinance and forfeiting five per cent of his contract price? If so what sound public policy is subserved by that view?

Look at the matter from still another side. Contractors, for private as well as municipal work, up to the time of the passage of the Act of 1903, now under review, had always been able to protect themselves against loss or damage by reason of a time limit by inserting a proviso in the contract (if between private individuals) that the time lost on the happening of strikes, injunctions, bad weather in which they could not work, etc., should be allowed them. If the contract was for street improvements it was the settled doctrine of this court to permit a flexibility and adjustability in the ordinance and contract of the same sort. [Allen v. Labsap, 188 Mo. 696-7, and cases cited.] The history of street improvements, as gleaned from the records of this and other appellate courts in Missouri, shows that in one form or another somewhere along the line the contractor has been protected on a time limit against the hazard of being interrupted in his work by causes over which he has no control. It is plain as a pike staff that such reasonable flexibility, by shielding the contractor from dangers of that ilk, would tend to lower the costs of street improvements. Now, in construing a law we must consider the condition of things presented to the lawmaker at the time he is called upon to act, and keep in mind the mischief to be avoided and the cure provided. Is it thinkable that the Legislature would deny to a city council the common-sense power to put into its ordinance and contract a provision that the whole contracting world enjoys and which city councils had been wisely using up

to that time? If such had been the legislative intent would it not have been plainly so written in the law by express words or by inexorable implication? It was doubtless on the theory that the statute in hand did not intend to take away from city councils a power so essential in obtaining a reasonable contract price in street work that the city council of St. Joseph put into its ordinance and contract the proviso that "the days' work lost in consequence of injunction or court proceedings, bad weather, work which is being done by other persons over whom the contract has no control, organized general strikes," etc., shall be added to the ten months in which the contract is to be completed. Does it follow that the public are inconvenienced by that arrangement as indicated by Rackliff v. Peters, *supra?* We think not, because unless an ordinance and contract are allowed flexibility enough to permit such provision then a hard-and-fast time limit would have to be agreed to of such extreme duration as would cover all possible accidents of that sort and keep the public streets of cities torn up as long as or longer than under the other plan.

(2)  Nevertheless, it must be conceded to respondent that the Legislature of the State of Missouri has at present the inalienable right to act unreasonably in passing a law. It is not presumed to act in that way and courts will labor mightily in interpreting statutes to save it from the charge of having done so, but, if worst comes to worst, it may pass an unjust law or one sounding to folly, which courts will enforce because there are no two ways about it, or any way out of it. For in the construction of laws it sometimes happens that the intent of the Legislature is so clearly manifest that courts are relieved from searching out the reason of the law. In such case they must content themselves with the words of the law without inquiry into its reasons. (*Ita lex scripta est.*) So that the question narrows itself to this: Has the Legislature by the lan-

guage of the Act of 1903, *viz.*, "every ordinance for public improvement . . . shall fix the time within which such work shall be completed after the contract therefor shall be awarded," taken away the sensible municipal power of passing a fair ordinance and making a fair contract, permitting contractors to bid for street work on the theory there shall be counted out of the period prescribed for the completion of the work days lost for causes enumerated in the ordinance in question?

"Fix," as defined by lexicographers, is used sometimes to accentuate the idea of firmness, stability, immobility, permanence, without variation—but in laws, documents and conversation it is not always used in that strong way. It may mean (depending somewhat upon the context and sense of the thing) prescribe, allow, designate, arrange, determine, decide.

In Cricket v. State, 18 Ohio St. 9, the following provision of the Constitution was under exposition: "The General Assembly, in cases not provided for in this Constitution, shall *fix* the term of office and the compensation of all officers." It was there ruled (p. 21) that: "The duty enjoined by this section in regard to fixing the compensation of officers, does not require the General Assembly to fix the sum or amount which each officer is to receive, *but only requires that it shall prescribe or 'fix' the rule by which such compensation is to be determined.*"

A provision of the Constitution of the State of Mississippi required the compensation of the district attorney to be "a fixed salary." Another provision allowed the Legislature to regulate by law cases in which deductions should be made from salaries of public officers "for neglect of official duty." There was a provision in the statutes of that State directing a deduction from the salary of the District Attorney for absence from the circuit court of his district, "arising

from whatever cause." The State Auditor deducted from the salary of Mr. Humphries, District Attorney, $295 for absence from court by reason of sickness. The matter coming before the Supreme Court (Cole v. Humphries, 78 Miss. 163) it was ruled that the constitutional provision permitting the Legislature to regulate the deduction from the salaries of the public officers for the neglect of official duty was not preclusive. It did not interdict the Legislature from passing laws providing for reductions in the salaries of public officers failing for any cause to perform the duties of their office. It was argued that the constitutional term "fixed salary" forbids reduction for sickness. On that argument it was ruled: "We regard the word 'fixed' in that section, as having no more significance than to mark the change from a system of fees and salaries to one for a salary alone."

In People ex rel. v. Loeffler, 175 Ill. 585, the following provision of the Constitution was under exposition: "An office is a public position, created by the Constitution or law, continuing during the pleasure of the appointing power, or for a fixed time, with a successor elected or appointed." Under the civil service act of that State it was argued that office may be held during good behavior, or until removal or discharge for cause, and that such tenure is not recognized by the Constitution. In this connection stress was laid upon the above constitutional words "fixed time." Upon that argument it was ruled: "But the words, 'fixed time,' as here used, do not necessarily mean a definite period, as for instance one year, two years or three years. On the contrary, they refer to a term of office which is established or settled, as contradistinguished from a term which depends upon the mere will or pleasure of the appointing power. A man who is appointed to hold his office during good behavior, or until removal or discharge for cause, occupies it for a settled and established term; and the time for which he occu-

pies it, is in a certain sense a fixed time, because it does not end at the pleasure of the appointing power.''

That the word ''fix'' may be used in the sense of ''allow'' has been often ruled. [Hinds v. Marmolejo, 60 Cal. 229; Guild v. Bank, 4 S. D. 566; Wolverton v. Bank, 11 Wash. 94; Polk v. County, 5 Dak. 129.]

White v. Harris, 103 Cal. 528, was an action to foreclose a lien arising from the assessment of a lot for the construction of a sewer. The law provided, among other things, that the superintendent of streets ''shall *fix* the time for the commencement (referring to the work to be performed under the contract), which shall not be more than fifteen days from the date of the contract.'' The contract provided as follows: ''Work to be commenced within fifteen days.'' It was argued that the contract did not *fix the date* for the commencement of the work as provided by law. Upon that contention the court ruled: ''The word 'time' as here used was not intended to mean a particular day to be fixed by the superintendent of streets for the commencement of the work, but that the time fixed by him for that purpose should not be more than fifteen days from the date of the contract.''

The foregoing authorities illustrate that the word ''fix'' is sometimes used in a broad sense and sometimes in a narrow sense; that there is no charm about the word itself dominating the situation so that it may not be construed to make the statute comport with reason. The phrase ''shall fix the time within which such work shall be completed after,'' etc., does not mean to fix the date at which work shall commence nor the date when it shall end. The very bowels of the text, therefore, import flexibility. The contractor under that provision having ten months time might complete his work within one week and that week the last one or the first one. We are of the opinion that the maxim, That is certain which can be made certain, has application and that the statute means no more than the language

meant in the Cricket case, *supra,* to wit, *prescribe or fix the rule by which the time is to be determined.* If then the ordinance had said the work should be completed in ten months of thirty days each, Sundays and legal holidays excluded in computing the time, it would have been sufficiently certain. Instead of saying that, it says that those days shall not be counted as part of the ten months which are lost by injunctions, etc. Are not all the days to be counted out, if any, easily susceptible of being ascertained? We can see no injury resulting to the property-owner from the arrangement and we consider it not obnoxious to the language of the statute when justly construed in the interest of the integrity of contracts and the public welfare. Those courts, says Lord Hobart, are to be condemned "that either out of pleasure to shew a subtle wit, will destroy, or out of incuriousness or negligence will not labor to support, the act of the party by the art or act of law." [Pits v. James, Hob. l. c. 125a, 125b; Clanrickard v. Sidney, *ibid,* 277 b.]

The premises considered, we rule the ordinance in question is not obnoxious to the charter of St. Joseph (section 9, *supra,* Laws of 1903), and this holding necessarily overrules Rackliff v. Peters, *supra.*

(c) The matter alleged to be obnoxious in the ordinance and contract is inserted by way of proviso. Where a proviso is repugnant or inconsistent with the purview of the act it is common learning that the latter must prevail. A void part of an ordinance, law or contract (absent elements of fraud in the latter) does not necessarily make the whole void unless made void by the statute itself. It was a famous saying of the same great judge just quoted that where a contract is void by statute it is wholly void, "for the statute is like a tyrant; where he comes he makes all void; but the common law is like a nursing-father, makes void only that part where the fault is, and preserves the rest." [Maleverer v. Redshaw, 1 Mod. 35.] If the void part is so

interwoven with other provisions as to make them all interdependent or enough of them interdependent to spoil the symmetry and perfection—the one resting on the other or furnishing a motive for the other—then the void provision strikes down the whole, but where the void part stands as an independent clause segregated from the main body and where, if eliminated by judicial construction, a perfect ordinance and contract would remain, as is the case here, the void part might be pruned away as a dead limb and leave the ordinance and contract intact as live and enforceable. [See authorities cited in appellant's brief in chief.]

In the case at bar the contractor had asked no extension of time. He was acting within his ten months. He asked nothing on the strength of the proviso. Therefore, if we were to hold the proviso void as obnoxious to the statute, we would still have to hold that the petition stated no case for equitable interference. But we prefer to let the case on the point in hand, break on what is said in paragraphs *a* and *b*.

II.    Another proposition discussed in the briefs relates to the ''designating notice.'' It is insisted that such notice was insufficient and therefore the whole improvement scheme falls to the ground. It is argued for respondent, and alleged in his bill, that the notice is, first, not in conformity with the charter governing cities of the second class, and, second, is in violation of section 30 of article 2 of the Constitution of the State of Missouri as seeking to deprive the plaintiff of his property by assessing thereon taxbills for the doing of said work without due process of law. Is there substance in either of these contentions? We think not, because:

(a)   The charter scheme for street improvements in cities of the second class (section 8, Laws of 1903, p. 60, *supra*) contemplates that a street improvement may be initiated in two ways: First, by the board of

public works moving unanimously on its own motion; second, upon a petition by the resident owners of a majority of front feet abutting on the street. That scheme contemplates that the board of public works may, in the first instance, and shall in the second instance, prepare an ordinance for the improvement contemplated to be submitted to the city council, but before such ordinance shall be submitted an advertisement must be inserted for five days in the official paper of the city. The charter ordains that such advertisement shall "notify all persons interested of the time and place . . . . when and where the said board will hear objections to such proposed ordinance, at which time and place the board shall attend and hear and pass upon all objections that may be presented." If the board shall overrule the objections the scheme contemplates that the matter shall be continued for fifteen days. When that time comes the resident owners of the majority of front feet abutting on the street to be improved have the right to select in writing any material desired by them to be used in making the improvement. The scheme further contemplates that only the materials so selected shall be embraced in the ordinance the board may recommend and that no ordinance specifying any other material shall be valid, provided the material selected shall be reasonably available. If, however, the resident abutting property-owners make no selection in writing the board of its own motion may select and recommend the material to be used. The scheme further contemplates that finally the proposed ordinance and a copy of the petition for the improvement, if any, together with all objections that may have been filed with the board, together with such recommendations as the board may desire to make, together with the full plans and estimates of the cost of the contemplated improvement shall be transmitted to the city council for its action.

Keeping in view the charter scheme thus outlined,

it is argued by learned counsel for respondent that the
"designating notice" should briefly state the terms of
the ordinance as to grade, time and material. But it
is self-evident that whatever notice may be necessary
under other charter schemes, the notice contemplated
by section eight, *supra,* need not descend to such par-
ticularity. This for the very good reason that section
eight does not contemplate that the proposed ordi-
nance shall have been already licked into shape when
the citizens meet to offer their advisory objections, if
any. They have the right to select their own material
at the end of another period of fifteen days and that
material must be inserted in the ordinance if selected
as provided by the charter. The dominating idea, we
think, is that notification be given that the street is to
be improved in certain particulars and of the time and
place when the citizens may meet and advise with the
board. The preliminary question is: Shall it be im-
proved at all in curb, grade, pavement? To that end
those who pay the bills are notified to come together
and make their suggestions and objections after an in-
terchange of views and an examination of the *data* at
hand in the office of the board of public works. After
this hearing the ordinance is shaped up and then it, the
estimates, objections and petition, if any, are bundled
up and sent to the city council for its consideration.
The charter purposely avoids particulars in the notice.
The time is regulated by the ordinance and if the no-
tice particularized by suggesting a time limit, say, one
month, and the citizens met to consider that proposi-
tion and approved it or did not object to it and then
the ordinance allowed ten months, such variance would
work a wrong upon the citizen. The notice wisely
omits the contemplated time limit. So leaving the
grade out of the notice leaves the whole matter to be
adjusted by the board after hearing from interested
citizens. So, as to material. Why mention materials

in the notice when the citizens fifteen days later may select their own?

The charter scheme held in judgment in Kirksville v. Coleman, 103 Mo. App. 215, differed in essentials from the one under consideration. We are asked to overrule that case or to disapprove its reasoning. We shall do neither because to do so would be *obiter*. The case is no authority for appellant's position in this case. The designating notice heretofore set forth substantially complied with section eight of the charter scheme.

The point is ruled against respondent.

(b) But it is argued that plaintiff was denied due process of law. Section 30, article 2, of the Constitution reads: "That no person shall be deprived of life, liberty or property without due process of law." Special assessments for local improvements are referable to the taxing power. Publications of notice to the property-owners and opportunity to be heard before the tribunal having the duty of ascertaining the facts and acting in the special assessment procedure satisfy the constitutional requirement and are due process of law as to those matters. [Meier v. St. Louis, 180 Mo. l. c. 409, and authorities cited. See, also, Springfield v. Weaver, 137 Mo. 650; Naylor v. Harrisonville, 207 Mo. l. c. 353; St. Joseph v. Truckenmiller, 183 Mo. l. c. 16; Eyerman v. Blaksley, 78 Mo. 145; Keith v. Bingham, 100 Mo. 300.] The point is ruled against respondent.

The judgment should be reversed and the cause remanded with directions to the lower court to sustain defendant's demurrer. It is so ordered. All concur, *Valliant, C. J.,* in result.